J-A06024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GERALD M. MEDVED AND SHIRLEY MEDVED, HIS WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VERNON SMITH AND SHEILA SMITH, HIS WIFE | : | No. 724 WDA 2020 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered August 6, 2020
In the Court of Common Pleas of Fayette County Civil Division at No(s):
1898 of 2012 G.D.

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED: APRIL 16, 2021**

Vernon Smith and Sheila Smith (the Smiths), h/w, appeal from the final judgment entered in the Court of Common Pleas of Fayette County in favor of Appellees, Gerald M. Medved and his wife, Shirley Medved (the Medveds). After careful review, we affirm.

The instant quiet title action involves a wedge-shaped 8.0691 acre tract of land (Property) located in Springhill Township, Fayette County.  The Property is situated directly to the south of the Smiths' property and to the east and west of other land owned by the Medveds.  The Property was initially part of a farm (Robinson Farm), which was acquired in 1952 from the Smiths'

predecessor, Jules J. Quertinmont, Jr. In the mid-to-late 1940s,[1] Gerald's parents, George and Charlotte Medved (George and Charlotte), purchased land (Medved Farm) from John Brajokovich. George and Charlotte utilized the Property as if it were part of the Medved Farm. Gerald Medved testified that a barbed-wire fence encloses the entire Medved Farm, including the northern portion of the Property. The Medveds obtained title to the Medved Farm in November 2001, when Charlotte Medved passed away. The Property was not described in the deed conveying the land from Charlotte to the Medveds; it was, however, described in the Smiths' deed.

The northern edge of the Property is separated from the Smiths' land by a four-strand barbed wire fence attached to posts. The fence was erected in the early 1940s and maintained by George and Charlotte, their agents, and other Medved family members. The fence has never been removed and there is no gate on the fence line between the Property and the Smiths' land. Additionally, no fence borders the east or west sides of the Property.[2]

Gas transmission lines were installed south of the northern edge of the Property in 1962; George and Charlotte received compensation from gas

_____

[1] George and Charlotte acquired the Medved Farm in two separate transactions. N.T. Non-Jury Trial, 11/19/19, at 31-32. In 1945, they purchased twenty-four acres and, in 1949, they purchased the remaining twelve acres. *Id.* at 32. The land purchased in 1949, which included the Property, was never surveyed. *Id.* George and Charlotte and their family moved onto the Medved Farm in 1945. *Id.* at 30.

[2] A now-unoccupied house, that was once occupied by Gerald, his parents, siblings and Brajokovich, and later by Charlotte until her death, is located within the perimeter of the Medved Farm, but not on the Property.

companies for rights-of-way across the Property in order to install the lines. George mined coal on the Property from the 1940s through 1962. In the mid-1950's, a lumber company timbered the entire Medved Farm, including the Property. Some backfilling and excavation work was conducted on the Property in the 1970s and 1990s, respectively. A farm road, running east-west, bisects the southern portion of the Property. The land below the Property's southern boundary line is wooded land. A surveyor, hired by the Medveds for trial, testified that although there are some trees on the Property, it is properly classified as pastureland, not woodland.[3]

On August 17, 2012, the Medveds filed an action to quiet title to the Property against the Smiths, asserting[4] their right based on two legal theories: adverse possession and boundary by recognition and acquiescence (or, consentable boundary). During a three-day non-jury trial held in November 2018, the Medveds presented over 25 witnesses and 40 exhibits, including tax

_____

[3] "Woodland" is often just another name for a forest. **See** https://www.nationalgeographic.org/encyclopedia/woodland (last visited 4/6/21). Most of the time, though, geographers use the term to describe a forest with an open canopy. **Id.** The canopy is the highest layer of foliage in a forest[; i]t is made up of the crowns, or tops, of trees. **Id.** Pastureland, on the other hand, is a "diverse type of land where the primary vegetation produced is herbaceous plants and shrubs." **See** https://www.nrcs.usda.gov/wps/portal/nrcs/detail/national/landuse/rangepasture/?cid=nrcsdev11_001074 (last visited 4/6/21). These lands provide forage for beef cattle, dairy cattle, sheep, goats, horses[,] and other types of domestic livestock. **Id.**

[4] The complaint was amended, in response to preliminary objections filed by the Smiths, to plead more specifically.

claim and property maps, photos of the subject property over the years, land surveys, coal and gas company receipts, plats, and a gas company right-of-way agreement. Following trial, the court entered judgment in favor of the Medveds, concluding that they established title to the Property on the basis of a consentable line by recognition and acquiescence. The Smiths filed post-trial motions that were denied. They then filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, the Smiths raise the following issues for our consideration:

> (1) Did the trial [court] fail to apply the strict standards set forth by the Pennsylvania Supreme Court which requires Plaintiffs to prove a fence as a boundary line by recognition and acquiescence in order to prevail?
>
> (2) Did the trial [court] err in finding that undeveloped acreage had been occupied continuously for 21 years when there is no evidence that any structure or fencing was ever erected upon the land in question and there was no evidence of ongoing cultivation of the land in question in contravention of well-settled adverse possession principles that have also been incorporated into the doctrine of consentable boundary line by recognition and acquiescence.

Appellants' Brief, at 4.

Our standard of review of verdicts in bench trials is as follows:

Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not

whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Lynn v. Pleasant Valley Country Club*, 54 A.3d 915, 919 (Pa. Super. 2012) (internal citations omitted).

The Smiths allege that the trial court erred by not applying "the strict requirements . . . regarding the establishment of a binding consentable line by recognition and acquiescence" and in finding that the Medveds "had occupied the undeveloped acreage continuously for 21 years when there was no evidence that any structure or fencing was ever erected" upon the Property or any evidence of "on[-]going cultivation" of the Property. Appellants' Brief, at 13. The Smiths also argue that there was insufficient evidence showing that they had disclaimed ownership of the Property. Appellants' Brief, at 16. Such lack of evidence, they claim, fails to establish the "occupancy" requirement necessary to prove the doctrine of consentable boundary line by recognition and acquiescence. *Id.* at 20.

Instantly, the trial court found that: the Property was in continuous control of the Medveds and their predecessors in title;[5] the Property was solely used by the Medveds, their family members, and friends; the use of the land varied at times from cultivation, strip mining, and grazing land for horses and

_____

[5] "[T]acking [of privity of possession] is permitted [under a theory of acquiescence in a boundary] upon sufficient and credible proof of delivery of conveyance, which was previously claimed and occupied by the grantor and is taken by the grantee as successor in such interest." *Zeglin v. Gahagen*, 812 A.2d 558, 566 (Pa. 2002).

cows; and that the Medveds have established that they were in possession of the Property as they maintained dominion over the parcel. Trial Court Opinion, 9/21/20, at 6. Specifically, the court noted that the Property "was entirely contained within the fenced area of the Medved farm [and that the Medveds'] control was open, notorious and hostile." *Id.*

"One who claims title by adverse possession must prove actual, continuous, exclusive, visible, notorious, distinct[,] and hostile possession of the land for twenty-one years. Each of these elements must exist; otherwise, the possession will not confer title." *Recreation Land Corp. v. Hartzfeld*, 947 A.2d 771, 774 (Pa. Super. 2008) (citation omitted). "Generally, 'actual possession of land means dominion over the property.'" *Bride v. Robwood Lodge*, 713 A.2d 109, 112 (Pa. Super. 1998). However, "[w]hat constitutes adverse possession depends, to a large extent, on the character of the premises." *Id.*

The doctrine of consentable line, which is a separate and distinct theory from adverse possession, is a rule of repose for the purpose of quieting title and discouraging confusing and vexatious litigation. *Plott v. Cole*, 547 A.2d 1216, 1220 (Pa. Super. 1988). In order to establish a binding consentable line by recognition and acquiescence, a party must prove that: (1) each party has claimed the land on his side of the line as his own; and (2) that this occupation has occurred for the statutory period of twenty-one years. *Id.* at 1221. "[A]cquiescence," in the context of a dispute over real property, "denotes passive conduct on the part of the lawful owner consisting of failure

on his part to assert his paramount rights or interests against the hostile claims of the adverse user." **Zeglin**, **supra** at 562 n.2 (quotation omitted). "[W]hen a consentable line is established, the land behind such a line becomes the property of each neighbor regardless of what the deed specifies." **Moore v. Moore**, 921 A.2d 1, 5 (Pa. Super. 2007). **See Soderberg v. Weisel**, 687 A.2d 839, 843 (Pa. Super. 1997) (citation omitted) ("In essence, each neighbor gains marketable title to that land behind the line, some of which may not have been theirs under their deeds.").

Instantly, the trial court found that the properties owned by the Medveds and the Smiths have been separated by a fence that has been maintained by the Medved family over the years. The court found that the fence "completely separates the entirety of the [Property] from the Smiths' [p]roperty." Trial Court Opinion, 9/21/20, at 2. Moreover, when George and Charlotte moved onto the Medved Farm in 1945, it was already surrounded by a fence that "has remained in the same location and has been repaired over the years by both [George and Charlotte] and the [Medveds]." **Id.** at 3. **See** N.T. Non-Jury Trial (George Medved's testimony), 11/19/18, at 30, 40, 52-53, 68, 77 (fence existed on Medved Farm since he was little child in 1945, no one ever disputed Medveds' ownership of Property, and he maintained fence since George and Charlotte acquired farm in early 1940s); **id.** at 35 ("Well, everybody had their farms fenced in. And that whole farm had four strands of barbed wire on the whole thing that I can remember. When we bought it, you know, a fence— that I can remember. . . . I am sure the whole farm had four strands [of

barbed wire] on it [when we bought it].”); *id.* at 38 (recalling fence was continuous and enclosed Property in 1950); *see also id.* at 7 (land surveyor’s testimony) (in July 2012 he noticed “[a]long the northern edge of the delineated area[,] there’s a substantial [barbed] wire fence that runs the whole length”); *id.* (beneath fence line multiple gas line rights-of-way located); i*d.* at 10 (“It’s an old fence, a substantial fence and it looks like it has been . . . maintained.”); i*d.* (did not remember any gates or openings of fence line between Property and Smiths’ property); i*d.* (fence on Medved’s property enclosed or closed off Property from Smiths’ property).

Based on the testimony at trial, the court found:  that the subject fence, which admittedly needed repairs over the years, does not include any gate or opening on to the Smiths’ property; the remainder of the Property is contained completely within the fenced area of the Medved Farm; and the Property has no features that distinguish it from the remining land of the Medved Farm. *Id.  See also Dimura v. Williams*, 286 A.2d 370 (Pa. 1972) (unlike adverse possession, not essential that fence line as boundary for consentable line be substantial).

With regard to activity that took place on the Property, the court found that Gerald Medved’s family conducted strip-mining activity on the Property, altered the terrain in the 1990s by backfilling, and permitted a gas company to place lines on the Medved Farm intersecting the Property.  *See id.* at 40 (George Medved testifying his father mined coal from 1949 to 1969 on Property); *id.* at 46 (Columbia Gas installed subterraneous gas lines on

Property in 1962); *id.* at 50 (Medveds had to backfill Property because there was a "big cut" like a canyon down through land and all around it in 1970s and 1980s); *id.* at 52 (George Medved maintained road on eastern boundary of Property that he consistently used to haul coal). Further, the entire Medved family raised crops, grew hay, hunted, and grazed animals on the Property; they also used the Property as a play area for children. *Id.* (when George and Charlotte purchased Medved Farm, it was pastureland used to cultivate soybeans, corn, potatoes and also used to pasture cows and horses).

The court concluded that each party had acted as though the land on their side of the fence was their own property, that the Medveds had occupied the Property continuously since George and Charlotte purchased the property in 1945, and that George and Charlotte controlled the Medved Farm (which included the Property) continuously and uninterrupted until it was transferred to the Medveds. Finally, the court found the Medveds established that the fence line separated the Smith's property from the Property for "a period in excess of 21 years." *Id.* at 5. *See Schimp v. Allman*, 659 A.3d 1032,1034 (Pa. Super. 1995) (citation omitted) (question where boundary line is actually located is for trier of fact; where trial judge sits as fact-finder, appellate court will not reverse court's decision on appeal unless trial court's findings are not supported by credible evidence).

Here, the trial court found that the Medveds established their "hostile" occupation of the Property through testimony presented by various witnesses at trial. Specifically, that testimony showed that the Smiths asked the

Medveds for permission to enter onto the Property to hunt and that the Smiths never made a demand for the removal of a portion of the fence that separated the parties' properties. *See* N.T. Non-Jury Trial, 11/19/18, at 7-8 (along bottom part of land survey is farm road that traverses subject property; Medveds used road without any objections by Smiths to go across subject Property to other side of Medved Farm). Moreover, the court noted that the Smiths did not present any evidence that they or their predecessors-in-title ever had dominion over the Property.

We conclude that the trial court reasonably reached its verdict based upon credible evidence presented at trial. *Lynn*, *supra*. Specifically, the court's following findings are supported by the record: the Medveds and their prior owners possessed the Property to the exclusion of the Smiths or their predecessors for over 21 years, *Moore*, *supra*; the entire Property was contained within the fenced area for over 21 years; and, the Medveds and their family openly and hostilely controlled the Property for the requisite length of time. *Zeglin*, *supra*.[6]

Accordingly, we affirm the trial court's determination that the Medveds established the right to the Property based on a consentable boundary line. *Schimp*, *supra* (evidence that claimant grew crops, pastured cattle, and

---

[6] While these terms are most often associated with traditional adverse possession, in the case of consentable line by acquiescence "the use or occupancy of the premises is [also] hostile to and against the interests of the title owner." *Id.* at 562 n.5. *Id.* at 562 ("doctrinal roots of acquiescence are grounded in adverse possession theory").

constructed track road over disputed land for period exceeding 21 years, established dominion over land and boundary by consentable line); ***Dimura***, ***supra*** at 371 (appellant's long-standing fence line, when joined with other fences, established appellant's ownership of strip of land where it was recognized as boundary line between her property and neighbors' parcels).

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/2021